(Slip Opinion)          OCTOBER  TERM 2004                    1

NOTE:  Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION ET AL. *v*. BRAND X INTERNET SERVICES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 04–277.   Argued March 29, 2005—Decided June 27, 2005*

Consumers traditionally access the Internet through "dial-up" connec-
tions provided via local telephone lines.  Internet service providers
(ISPs), in turn, link those calls to the Internet network, not only by
providing a physical connection, but also by offering consumers the
ability to translate raw data into information they may both view on
their own computers and transmit to others connected to the Inter-
net.  Technological limitations of local telephone wires, however, re-
tard the speed at which Internet data may be transmitted through
such "narrowband" connections.  "Broadband" Internet service, by
contrast, transmits data at much higher speeds.  There are two prin-
cipal kinds of broadband service: cable modem service, which trans-
mits data between the Internet and users' computers via the network
of television cable lines owned by cable companies, and Digital Sub-
scriber Line (DSL) service, which uses high-speed wires owned by lo-
cal telephone companies.  Other ways of transmitting high-speed
Internet data, including terrestrial- and satellite-based wireless net-
works, are also emerging.
   The Communications Act of 1934, as amended by the Telecommu-
nications Act of 1996, defines two categories of entities relevant here.
"Information service" providers—those "offering . . . a capability for
[processing]  information  via  telecommunications,"   47   U. S. C.

——————
   *Together with No. 04–281, *Federal Communications Commission
et al.* v. *Brand X Internet Services et al.,* also on certiorari to the same
court.

§153(20)—are not subject to mandatory regulation by the Federal Communications Commission as common carriers under Title II of the Act. Conversely, telecommunications carriers—*i.e.,* those "offering . . . telecommunications for a fee directly to the public . . . regardless of the facilities used," §153(46)—are subject to mandatory Title II regulation. These two classifications originated in the late 1970's, as the Commission developed rules to regulate data-processing services offered over telephone wires. Regulated "telecommunications service" under the 1996 Act is the analog to "basic service" under the prior regime, the *Computer II* rules. Those rules defined such service as a "pure" or "transparent" transmission capability over a communications path enabling the consumer to transmit an ordinary-language message to another point without computer processing or storage of the information, such as via a telephone or a facsimile. Under the 1996 Act, "[i]nformation service" is the analog to "enhanced" service, defined by the *Computer II* rules as computer-processing applications that act on the subscriber's information, such as voice and data storage services, as well as "protocol conversion," *i.e.*, the ability to communicate between networks that employ different data-transmission formats.

In the *Declaratory Ruling* under review, the Commission classified broadband cable modem service as an "information service" but not a "telecommunications service" under the 1996 Act, so that it is not subject to mandatory Title II common-carrier regulation. The Commission relied heavily on its *Universal Service Report,* which earlier classified "non-facilities-based" ISPs—those that do not own the transmission facilities they use to connect the end user to the Internet—solely as information-service providers. Because Internet access is a capability for manipulating and storing information, the Commission concluded, it was an "information service." However, the integrated nature of such access and the high-speed wire used to provide it led the Commission to conclude that cable companies providing it are not "telecommunications service" providers. Adopting the *Universal Service Report*'s reasoning, the Commission held that cable companies offering broadband Internet access, like non-facilities-based ISPs, do not offer the end user telecommunications service, but merely use telecommunications to provide end users with cable modem service.

Numerous parties petitioned for review. By judicial lottery, the Court of Appeals for the Ninth Circuit was selected as the venue for the challenge. That court granted the petitions in part, vacated the *Declaratory Ruling* in part, and remanded for further proceedings. In particular, the court held that the Commission could not permissibly construe the Communications Act to exempt cable companies provid-

ing cable modem service from mandatory Title II regulation. Rather than analyzing the permissibility of that construction under the deferential framework of *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, however, the court grounded that holding in the *stare decisis* effect of its decision in *AT&T Corp.* v. *Portland,* 216 F. 3d 871, which had held that cable modem service is a "telecommunications service."

*Held:* The Commission's conclusion that broadband cable modem companies are exempt from mandatory common-carrier regulation is a lawful construction of the Communications Act under *Chevron* and the Administrative Procedure Act. Pp. 8–32.

　1. *Chevron*'s framework applies to the Commission's interpretation of "telecommunications service." Pp. 8–14.

　　(a) *Chevron* governs this Court's review of the Commission's construction. See, *e.g., National Cable & Telecommunications Assn., Inc.* v. *Gulf Power Co.,* 534 U. S. 327, 333–339. *Chevron* requires a federal court to defer to an agency's construction, even if it differs from what the court believes to be the best interpretation, if the particular statute is within the agency's jurisdiction to administer, the statute is ambiguous on the point at issue, and the agency's construction is reasonable. 467 U. S., at 843–844, and n. 11, 865–866. The Commission's statutory authority to "execute and enforce" the Communications Act, §151, and to "prescribe such rules and regulations as may be necessary . . . to carry out the [Act's] provisions," §201(b), give the Commission power to promulgate binding legal rules; the Commission issued the order under review in the exercise of that authority; and there is no dispute that the order is within the Commission's jurisdiction. Pp. 8–10.

　　(b) The Ninth Circuit should have applied *Chevron*'s framework, instead of following the contrary construction it adopted in *Portland*. A court's prior construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. See *Smiley*, *supra*, at 740–741. Because *Portland* held only that the *best* reading of §153(46) was that cable modem service was "telecommunications service," not that this was the only permissible reading or that the Communications Act unambiguously required it, the Ninth Circuit erred in refusing to apply *Chevron.* Pp. 10–14.

　2. The Commission's construction of §153(46)'s "telecommunications service" definition is a permissible reading of the Communications Act at both steps of *Chevron*'s test. Pp. 14–29.

　　(a) For the Commission, the question whether cable companies providing cable modem service "offe[r]" telecommunications within

§153(46)'s meaning turned on the nature of the functions offered the *end user*. Seen from the consumer's point of view, the Commission concluded, the cable wire is used to access the World Wide Web, newsgroups, etc., rather than "transparently" to transmit and receive ordinary-language messages without computer processing or storage of the message. The integrated character of this offering led the Commission to conclude that cable companies do not make a stand-alone, transparent offering of telecommunications. Pp. 15–17.

(b) The Commission's construction of §153(46) is permissible at *Chevron*'s first step, which asks whether the statute's plain terms "directly addres[s] the precise question at issue." 467 U. S., at 843. This conclusion follows both from the ordinary meaning of "offering" and the Communications Act's regulatory history. Pp. 17–25.

(1) Where a statute's plain terms admit of two or more reasonable ordinary usages, the Commission's choice of one of them is entitled to deference. See, *e.g., Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 498. It is common usage to describe what a company "offers" to a consumer as what the consumer perceives to be the integrated finished product, even to the exclusion of discrete components that compose the product. What cable companies providing cable modem service "offer" is finished Internet service, though they do so using the discrete components composing the end product, including data transmission. Such functionally integrated components need not be described as distinct "offerings." Pp. 17–21.

(2) The Commission's traditional distinction between basic and enhanced service also supports the conclusion that the Communications Act is ambiguous about whether cable companies "offer" telecommunications with cable modem service. Congress passed the Act's definitions against the background of this regulatory history, and it may be assumed that the parallel terms "telecommunications service" and "information service" substantially incorporated the meaning of "basic" and "enhanced" service. That history in at least two respects confirms that the term "telecommunications service" is ambiguous. First, in the *Computer II* order establishing the terms "basic" and "enhanced" services, the Commission defined those terms functionally, based on how the consumer interacts with the provided information, just as the Commission did in the order under review. Cable modem service is not "transparent" in terms of its interaction with customer-supplied information; the transmission occurs only in connection with information processing. It was therefore consistent with the statute's terms for the Commission to assume that the parallel term "telecommunications service" in §153(46) likewise describes a "pure" or "transparent" communications path not necessarily separately present in an integrated information-processing service

from the end-user's perspective. Second, the Commission's application of the basic/enhanced service distinction to non-facilities-based ISPs also supports the Court's conclusion. The Commission has historically not subjected non-facilities-based information-service providers to common carrier regulation. That history suggests, in turn, that the Act does not unambiguously classify nonfacilities based ISPs as "offerors" of telecommunications. If the Act does not unambiguously classify such providers as "offering telecommunications," it also does not unambiguously so classify facilities-based information-service providers such as cable companies; the relevant definitions do not distinguish the two types of carriers. The Act's silence suggests, instead, that the Commission has the discretion to fill the statutory gap. Pp. 21–25.

(c) The Commission's interpretation is also permissible at *Chevron*'s step two because it is "a reasonable policy choice for the agency to make," 467 U. S., at 845. Respondents argue unpersuasively that the Commission's construction is unreasonable because it allows any communications provider to evade common-carrier regulation simply by bundling information service with telecommunications. That result does not follow from the interpretation adopted in the *Declaratory Ruling*. The Commission classified cable modem service solely as an information service because the telecommunications input used to provide cable modem service is not separable from the service's data-processing capabilities, but is part and parcel of that service and integral to its other capabilities, and therefore is not a telecommunications offering. This construction does not leave all information-service offerings unregulated under Title II. It is plain, for example, that a local telephone company cannot escape regulation by packaging its telephone service with voice mail because such packaging offers a transparent transmission path—telephone service—that transmits information independent of the information-storage capabilities voice mail provides. By contrast, the high-speed transmission used to provide cable modem service is a functionally integrated component of Internet service because it transmits data only in connection with the further processing of information and is necessary to provide such service. The Commission's construction therefore was more limited than respondents assume.

Respondents' argument that cable modem service does, in fact, provide "transparent" transmission from the consumer's perspective is also mistaken. Their characterization of the "information-service" offering of Internet access as consisting only of access to a cable company's e-mail service, its Web page, and the ability it provides to create a personal Web page conflicts with the Commission's reasonable understanding of the nature of Internet service. When an end user

accesses a third party's Web site, the Commission concluded, he is equally using the information service provided by the cable company as when he accesses that company's own Web site, its e-mail service, or his personal webpage. As the Commission recognized, the service that Internet access providers offer the public is Internet access, not a transparent ability (from the end-user's perspective) to transmit information. Pp. 25–29.

3. The Court rejects respondent MCI, Inc.'s argument that the Commission's treatment of cable modem service is inconsistent with its treatment of DSL service and is therefore an arbitrary and capricious deviation from agency policy under the Administrative Procedure Act, see 5 U. S. C. §706(2)(A). MCI points out that when local telephone companies began to offer Internet access through DSL technology, the Commission required them to make the telephone lines used to provide DSL available to competing ISPs on nondiscriminatory, common-carrier terms. Respondents claim that the Commission has not adequately explained its decision not to regulate cable companies similarly.

The Court thinks that the Commission has provided a reasoned explanation for this decision. The traditional reason for its *Computer II* common-carrier treatment of facilities-based carriers was that the *telephone network* was the primary, if not the exclusive, means through which information service providers could gain access to their customers. The Commission applied the same treatment to DSL service based on that history, rather than on an analysis of contemporaneous market conditions. The Commission's *Declaratory Ruling*, by contrast, concluded that changed market conditions warrant different treatment of cable modem service. Unlike at the time of the DSL order, substitute forms of Internet transmission exist today, including wireline, cable, terrestrial wireless, and satellite. The Commission therefore concluded that broadband services should exist in a minimal regulatory environment that promotes investment and innovation in a competitive market. There is nothing arbitrary or capricious about applying a fresh analysis to the cable industry. Pp. 29–31.

345 F. 3d 1120, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, and BREYER, JJ., joined. STEVENS, J., and BREYER, J., filed concurring opinions. SCALIA, J., filed a dissenting opinion, in which SOUTER and GINSBURG JJ., joined as to Part I.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 04–277 and 04–281

NATIONAL CABLE & TELECOMMUNICATIONS
ASSOCIATION, ET AL., PETITIONERS

04–277                        *v.*
BRAND X INTERNET SERVICES ET AL.


FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES, PETITIONERS

04–281                        *v.*
BRAND X INTERNET SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE THOMAS delivered the opinion of the Court.

Title II of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. §151 *et seq.*, subjects all providers of "telecommunications servic[e]" to mandatory common-carrier regulation, §153(44). In the order under review, the Federal Communications Commission concluded that cable companies that sell broadband Internet service do not provide "telecommunications servic[e]" as the Communications Act defines that term, and hence are exempt from mandatory common-carrier regulation under Title II. We must decide whether that conclusion is a lawful construction of the Communications Act under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), and the Administrative Procedure

Act, 5 U. S. C. §555 *et seq.* We hold that it is.

## I

The traditional means by which consumers in the United States access the network of interconnected computers that make up the Internet is through "dial-up" connections provided over local telephone facilities. See 345 F. 3d 1120, 1123–1124 (CA9 2003) (cases below); *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd. 4798, 4802–4803, ¶9 (2002) (hereinafter *Declaratory Ruling*). Using these connections, consumers access the Internet by making calls with computer modems through the telephone wires owned by local phone companies. See *Verizon Communications Inc.* v. *FCC,* 535 U. S. 467, 489–490 (2002) (describing the physical structure of a local telephone exchange). Internet service providers (ISPs), in turn, link those calls to the Internet network, not only by providing a physical connection, but also by offering consumers the ability to translate raw Internet data into information they may both view on their personal computers and transmit to other computers connected to the Internet. See *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11531, ¶63 (1998) (hereinafter *Universal Service Report*); P. Huber, M. Kellogg, & J. Thorne, Federal Telecommunications Law 988 (2d ed. 1999) (hereinafter Huber); 345 F. 3d, at 1123–1124. Technological limitations of local telephone wires, however, retard the speed at which data from the Internet may be transmitted through end users' dial-up connections. Dial-up connections are therefore known as "narrowband," or slower speed, connections.

"Broadband" Internet service, by contrast, transmits data at much higher speeds. There are two principal kinds of broadband Internet service: cable modem service and Digital Subscriber Line (DSL) service. Cable modem

service transmits data between the Internet and users' computers via the network of television cable lines owned by cable companies. See *id.*, at 1124. DSL service provides high-speed access using the local telephone wires owned by local telephone companies. See *WorldCom, Inc.* v. *FCC*, 246 F. 3d 690, 692 (CADC 2001) (describing DSL technology). Cable companies and telephone companies can either provide Internet access directly to consumers, thus acting as ISPs themselves, or can lease their transmission facilities to independent ISPs that then use the facilities to provide consumers with Internet access. Other ways of transmitting high-speed Internet data into homes, including terrestrial- and satellite-based wireless networks, are also emerging. *Declaratory Ruling* 4802, ¶6.

## II

At issue in these cases is the proper regulatory classification under the Communications Act of broadband cable Internet service. The Act, as amended by the Telecommunications Act of 1996, 110 Stat. 56, defines two categories of regulated entities relevant to these cases: telecommunications carriers and information-service providers. The Act regulates telecommunications carriers, but not information-service providers, as common carriers. Telecommunications carriers, for example, must charge just and reasonable, nondiscriminatory rates to their customers, 47 U. S. C. §§201–209, design their systems so that other carriers can interconnect with their communications networks, §251(a)(1), and contribute to the federal "universal service" fund, §254(d). These provisions are mandatory, but the Commission must forbear from applying them if it determines that the public interest requires it. §§160(a), (b). Information-service providers, by contrast, are not subject to mandatory common-carrier regulation under Title II, though the Commission has jurisdiction to impose additional regulatory obligations under its Title I

ancillary jurisdiction to regulate interstate and foreign communications, see §§151–161.

These two statutory classifications originated in the late 1970's, as the Commission developed rules to regulate data-processing services offered over telephone wires. That regime, the "*Computer II*" rules, distinguished between "basic" service (like telephone service) and "enhanced" service (computer-processing service offered over telephone lines). *In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry),* 77 F. C. C. 2d 384, 417–423, ¶¶86–101 (1980) (hereinafter *Computer II Order*). The *Computer II* rules defined both basic and enhanced services by reference to how the consumer perceives the service being offered.

In particular, the Commission defined "basic service" as "a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." *Id.*, at 420, ¶96. By "pure" or "transparent" transmission, the Commission meant a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than the processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network—such as via a telephone or a facsimile. *Id.*, at 419–420, ¶¶94–95. Basic service was subject to common-carrier regulation. *Id.*, at 428, ¶114.

"[E]nhanced service," however, was service in which "computer processing applications [were] used to act on the content, code, protocol, and other aspects of the subscriber's information," such as voice and data storage services, *id.*, at 420–421, ¶97, as well as "protocol conversion" (*i.e.*, ability to communicate between networks that employ different data-transmission formats), *id.*, at 421–422, ¶99. By contrast to basic service, the Commission

decided not to subject providers of enhanced service, even enhanced service offered via transmission wires, to Title II common-carrier regulation. *Id.*, at 428–432, ¶¶115–123. The Commission explained that it was unwise to subject enhanced service to common-carrier regulation given the "fast-moving, competitive market" in which they were offered. *Id.*, at 434, ¶129.

The definitions of the terms "telecommunications service" and "information service" established by the 1996 Act are similar to the *Computer II* basic- and enhanced-service classifications. "Telecommunications service"—the analog to basic service—is "the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used." 47 U. S. C. §153(46). "Telecommunications" is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." §153(43). "Telecommunications carrier[s]"—those subjected to mandatory Title II common-carrier regulation—are defined as "provider[s] of telecommunications services." §153(44). And "information service"—the analog to enhanced service—is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . . . ." §153(20).

In September 2000, the Commission initiated a rulemaking proceeding to, among other things, apply these classifications to cable companies that offer broadband Internet service directly to consumers. In March 2002, that rulemaking culminated in the *Declaratory Ruling* under review in these cases. In the *Declaratory Ruling*, the Commission concluded that broadband Internet service provided by cable companies is an "information service" but not a "telecommunications service" under the Act, and therefore not subject to mandatory Title II common-carrier regulation. In support of this conclusion, the

Commission relied heavily on its *Universal Service Report.*
See *Declaratory Ruling* 4821–4822, ¶¶36–37 (citing *Universal Service Report* or *Report*). The *Universal Service
Report* classified "non-facilities-based" ISPs—those that do
not own the transmission facilities they use to connect the
end user to the Internet—solely as information-service
providers. See *Universal Service Report* 11533, ¶67.
Unlike those ISPs, cable companies own the cable lines
they use to provide Internet access. Nevertheless, in the
*Declaratory Ruling*, the Commission found no basis in the
statutory definitions for treating cable companies differently from non-facilities-based ISPs: Both offer "a single,
integrated service that enables the subscriber to utilize
Internet access service . . . and to realize the benefits of a
comprehensive service offering." *Declaratory Ruling* 4823,
¶38. Because Internet access provides a capability for
manipulating and storing information, the Commission
concluded that it was an information service. *Ibid.*

The integrated nature of Internet access and the high-
speed wire used to provide Internet access led the Com-
mission to conclude that cable companies providing Inter-
net access are not telecommunications providers. This
conclusion, the Commission reasoned, followed from the
logic of the *Universal Service Report.* The *Report* had
concluded that, though Internet service "involves data
transport elements" because "an Internet access provider
must enable the movement of information between cus-
tomers' own computers and distant computers with which
those customers seek to interact," it also "offers end users
information-service capabilities inextricably intertwined
with data transport." *Universal Service Report* 11539–
11540, ¶80. ISPs, therefore, were not "offering . . . tele-
communications . . . directly to the public," §153(46), and
so were not properly classified as telecommunications
carriers, see *id.,* at 11540, ¶81. In other words, the Com-
mission reasoned that consumers use their cable modems

not to transmit information "transparently," such as by using a telephone, but instead to obtain Internet access.

The Commission applied this same reasoning to cable companies offering broadband Internet access. Its logic was that, like non-facilities-based ISPs, cable companies do not "offe[r] telecommunications service to the end user, but rather . . . merely us[e] telecommunications to provide end users with cable modem service." *Declaratory Ruling* 4824, ¶41. Though the Commission declined to apply mandatory Title II common-carrier regulation to cable companies, it invited comment on whether under its Title I jurisdiction it should require cable companies to offer other ISPs access to their facilities on common-carrier terms. *Id.*, at 4839, ¶72. Numerous parties petitioned for judicial review, challenging the Commission's conclusion that cable modem service was not telecommunications service. By judicial lottery, the Court of Appeals for the Ninth Circuit was selected as the venue for the challenge.

The Court of Appeals granted the petitions in part, vacated the *Declaratory Ruling* in part, and remanded to the Commission for further proceedings. In particular, the Court of Appeals vacated the ruling to the extent it concluded that cable modem service was not "telecommunications service" under the Communications Act. It held that the Commission could not permissibly construe the Communications Act to exempt cable companies providing Internet service from Title II regulation. See 345 F. 3d, at 1132. Rather than analyzing the permissibility of that construction under the deferential framework of *Chevron*, 467 U. S. 837, however, the Court of Appeals grounded its holding in the *stare decisis* effect of *AT&T Corp.* v. *Portland*, 216 F. 3d 871 (CA9 2000). See 345 F. 3d, at 1128–1132. *Portland* held that cable modem service was a "telecommunications service," though the court in that case was not reviewing an administrative proceeding and the Commission was not a party to the case. See 216

F. 3d, at 877–880.  Nevertheless, *Portland*'s holding, the
Court of Appeals reasoned, overrode the contrary interpre-
tation reached by the Commission in the *Declaratory
Ruling.*  See 345 F. 3d, at 1130–1131.

We granted certiorari to settle the important questions
of federal law that these cases present.   543 U. S. __
(2004).

## III

We first consider whether we should apply *Chevron*'s
framework to the Commission's interpretation of the term
"telecommunications service."    We conclude that we
should.  We also conclude that the Court of Appeals should
have done the same, instead of following the contrary
construction it adopted in *Portland*.

## A

In *Chevron*, this Court held that ambiguities in statutes
within an agency's jurisdiction to administer are delega-
tions of authority to the agency to fill the statutory gap in
reasonable fashion.    Filling these gaps, the Court ex-
plained, involves difficult policy choices that agencies are
better equipped to make than courts.  467 U. S., at 865–
866.  If a statute is ambiguous, and if the implementing
agency's construction is reasonable, *Chevron* requires a
federal court to accept the agency's construction of the
statute, even if the agency's reading differs from what the
court believes is the best statutory interpretation.  *Id.*, at
843–844, and n. 11.

The *Chevron* framework governs our review of the Com-
mission's construction.   Congress has delegated to the
Commission the authority to "execute and enforce" the
Communications Act, §151, and to "prescribe such rules
and regulations as may be necessary in the public interest
to carry out the provisions" of the Act, §201(b); *AT&T
Corp.* v. *Iowa Utilities Bd.,* 525 U. S. 366, 377–378 (1999).

These provisions give the Commission the authority to promulgate binding legal rules; the Commission issued the order under review in the exercise of that authority; and no one questions that the order is within the Commission's jurisdiction. See *Household Credit Services, Inc.* v. *Pfennig,* 541 U. S. 232, 238–239 (2004); *United States* v. *Mead Corp.,* 533 U. S. 218, 231–234 (2001); *Christensen* v. *Harris County,* 529 U. S. 576, 586–588 (2000). Hence, as we have in the past, we apply the *Chevron* framework to the Commission's interpretation of the Communications Act. See *National Cable & Telecommunications Assn., Inc.* v. *Gulf Power Co.,* 534 U. S. 327, 333–339 (2002); *Verizon,* 535 U. S., at 501–502.

Some of the respondents dispute this conclusion, on the ground that the Commission's interpretation is inconsistent with its past practice. We reject this argument. Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 46–57 (1983). For if the agency adequately explains the reasons for a reversal of policy, "change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley* v. *Citibank (South Dakota), N. A.,* 517 U. S. 735, 742 (1996); see also *Rust* v. *Sullivan,* 500 U. S. 173, 186–187 (1991); *Barnhart* v. *Walton,* 535 U. S. 212, 226 (2002) (SCALIA, J., concurring in part and concurring in judgment). "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis," *Chevron, supra,* at 863–864, for example, in response to changed factual circum-

stances, or a change in administrations, see *State Farm*, *supra*, at 59 (REHNQUIST, J., concurring in part and dissenting in part). That is no doubt why in *Chevron* itself, this Court deferred to an agency interpretation that was a recent reversal of agency policy. See 467 U. S., at 857–858. We therefore have no difficulty concluding that *Chevron* applies.

B

The Court of Appeals declined to apply *Chevron* because it thought the Commission's interpretation of the Communications Act foreclosed by the conflicting construction of the Act it had adopted in *Portland*, *supra*. See 345 F. 3d, at 1127–1132. It based that holding on the assumption that *Portland*'s construction overrode the Commission's, regardless of whether *Portland* had held the statute to be unambiguous. 345 F. 3d, at 1131. That reasoning was incorrect.

A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. This principle follows from *Chevron* itself. *Chevron* established a "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Smiley*, *supra*, at 740–741. Yet allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute, as the Court of Appeals assumed it could, would allow a court's interpretation to override an agency's. *Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps. See 467 U. S., at 843–844, and n. 11. The better rule is to hold

judicial interpretations contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.

A contrary rule would produce anomalous results. It would mean that whether an agency's interpretation of an ambiguous statute is entitled to *Chevron* deference would turn on the order in which the interpretations issue: If the court's construction came first, its construction would prevail, whereas if the agency's came first, the agency's construction would command *Chevron* deference. Yet whether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur. The Court of Appeals' rule, moreover, would "lead to the ossification of large portions of our statutory law," *Mead, supra,* at 247 (SCALIA, J., dissenting), by precluding agencies from revising unwise judicial constructions of ambiguous statutes. Neither *Chevron* nor the doctrine of *stare decisis* requires these haphazard results.

The dissent answers that allowing an agency to override what a court believes to be the best interpretation of a statute makes "judicial decisions subject to reversal by Executive officers." *Post*, at 13 (opinion of SCALIA, J.). It does not. Since *Chevron* teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency's decision to construe that statute differently from a court does not say that the court's holding was legally wrong. Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes. In all other respects, the

court's prior ruling remains binding law (for example, as
to agency interpretations to which *Chevron* is inapplica-
ble). The precedent has not been "reversed" by the agency,
any more than a federal court's interpretation of a State's
law can be said to have been "reversed" by a state court
that adopts a conflicting (yet authoritative) interpretation
of state law.

The Court of Appeals derived a contrary rule from a
mistaken reading of this Court's decisions. It read *Neal* v.
*United States,* 516 U. S. 284 (1996), to establish that a
prior judicial construction of a statute categorically con-
trols an agency's contrary construction. 345 F. 3d, at
1131–1132; see also *post*, at 12, n. 11 (SCALIA, J., dissent-
ing). *Neal* established no such proposition. *Neal* declined
to defer to a construction adopted by the United States
Sentencing Commission that conflicted with one the Court
previously had adopted in *Chapman* v. *United States,* 500
U. S. 453 (1991). *Neal*, *supra*, at 290–295. *Chapman*,
however, had held the relevant statute to be unambigu-
ous. See 500 U. S., at 463 (declining to apply the rule of
lenity given the statute's clear language). Thus, *Neal*
established only that a precedent holding a statute to be
unambiguous forecloses a contrary agency construction.
That limited holding accorded with this Court's prior
decisions, which had held that a court's interpretation of a
statute trumps an agency's under the doctrine of *stare
decisis* only if the prior court holding "determined a stat-
ute's *clear* meaning." *Maislin Industries, U. S., Inc.* v.
*Primary Steel, Inc.,* 497 U. S. 116, 131 (1990) (emphasis
added); see also *Lechmere, Inc.* v. *NLRB,* 502 U. S. 527,
536–537 (1992). Those decisions allow a court's prior
interpretation of a statute to override an agency's inter-
pretation only if the relevant court decision held the stat-
ute unambiguous.

Against this background, the Court of Appeals erred in
refusing to apply *Chevron* to the Commission's interpreta-

tion of the definition of "telecommunications service," 47
U. S. C. §153(46). Its prior decision in *Portland* held only
that the *best* reading of §153(46) was that cable modem
service was a "telecommunications service," not that it was
the *only permissible* reading of the statute. See 216 F. 3d,
at 877–880. Nothing in *Portland* held that the Communi-
cations Act unambiguously required treating cable Inter-
net providers as telecommunications carriers. Instead, the
court noted that it was "not presented with a case involv-
ing potential deference to an administrative agency's
statutory construction pursuant to the *Chevron* doctrine,"
*id.*, at 876; and the court invoked no other rule of con-
struction (such as the rule of lenity) requiring it to con-
clude that the statute was unambiguous to reach its
judgment. Before a judicial construction of a statute,
whether contained in a precedent or not, may trump an
agency's, the court must hold that the statute unambigu-
ously requires the court's construction. *Portland* did not
do so.

   As the dissent points out, it is not logically necessary for
us to reach the question whether the Court of Appeals
misapplied *Chevron* for us to decide whether the Commis-
sion acted lawfully. See *post*, at 16–17 (opinion of SCALIA,
J.). Nevertheless, it is no "great mystery" why we are
reaching the point here. *Ibid.* There is genuine confusion
in the lower courts over the interaction between the *Chev-
ron* doctrine and *stare decisis* principles, as the petitioners
informed us at the certiorari stage of this litigation. See
Pet. for Cert. of Federal Communications Commission
et al. in No. 04–281, pp. 19–23; Pet. for Cert. of National
Cable & Telecomm. Assn. et al. in No. 04–277, pp. 22–29.
The point has been briefed. See Brief for Federal Petition-
ers 38–44; Brief for Cable-Industry Petitioners 30–36.
And not reaching the point could undermine the purpose
of our grant of certiorari: to settle authoritatively whether
the Commission's *Declaratory Ruling* is lawful. Were we

to uphold the *Declaratory Ruling* without reaching the *Chevron* point, the Court of Appeals could once again strike down the Commission's rule based on its *Portland* decision. *Portland* (at least arguably) could compel the Court of Appeals once again to reverse the Commission despite our decision, since our conclusion that it is *reasonable* to read the Communications Act to classify cable modem service solely as an "information service" leaves untouched *Portland*'s holding that the Commission's interpretation is not the *best* reading of the statute. We have before decided similar questions that were not, strictly speaking, necessary to our disposition. See, *e.g., Agostini* v. *Felton,* 521 U. S. 203, 237 (1997) (requiring the Courts of Appeals to adhere to our directly controlling precedents, even those that rest on reasons rejected in other decisions); *Roper* v. *Simmons,* 543 U. S. ___ , ___ (2005) (slip op., at 23–24) (SCALIA, J., dissenting) (criticizing this Court for not reaching the question  whether the Missouri Supreme Court erred by failing to follow directly controlling Supreme Court precedent, though that conclusion was not necessary to the Court's decision). It is prudent for us to do so once again today.

IV

We next address whether the Commission's construction of the definition of "telecommunications service," 47 U. S. C. §153(46), is a permissible reading of the Communications Act under the *Chevron* framework. *Chevron* established a familiar two-step procedure for evaluating whether an agency's interpretation of a statute is lawful. At the first step, we ask whether the statute's plain terms "directly addres[s] the precise question at issue."  467 U. S., at 843. If the statute is ambiguous on the point, we defer at step two to the agency's interpretation so long as the construction is "a reasonable policy choice for the agency to make." *Id.*, at 845. The Commission's interpre-

tation is permissible at both steps.

### A

We first set forth our understanding of the interpretation of the Communications Act that the Commission embraced. The issue before the Commission was whether cable companies providing cable modem service are providing a "telecommunications service" in addition to an "information service."

The Commission first concluded that cable modem service is an "information service," a conclusion unchallenged here. The Act defines "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications . . . ." §153(20). Cable modem service is an information service, the Commission reasoned, because it provides consumers with a comprehensive capability for manipulating information using the Internet via high-speed telecommunications. That service enables users, for example, to browse the World Wide Web, to transfer files from file archives available on the Internet via the "File Transfer Protocol," and to access e-mail and Usenet newsgroups. *Declaratory Ruling* 4821, ¶37; *Universal Service Report* 11537, ¶76. Like other forms of Internet service, cable modem service also gives users access to the Domain Name System (DNS). DNS, among other things, matches the Web page addresses that end users type into their browsers (or "click" on) with the Internet Protocol (IP) addresses[1] of the servers containing the Web pages the users wish to access. *Declaratory Ruling* 4821–4822, ¶37. All of these features, the Commission concluded, were part of the information service that cable companies provide consumers. *Id.*, at

---

[1] IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them. See *Universal Service Report* 11531, ¶62; Huber 985.

4821–4823, ¶¶36–38; see also *Universal Service Report* 11536–11539, ¶¶75–79.

At the same time, the Commission concluded that cable modem service was not "telecommunications service." "Telecommunications service" is "the offering of telecommunications for a fee directly to the public."  47 U. S. C. §153(46).  "Telecommunications," in turn, is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  §153(43).  The Commission conceded that, like all information-service providers, cable companies use "telecommunications" to provide consumers with Internet service; cable companies provide such service via the high-speed wire that transmits signals to and from an end user's computer.  *Declaratory Ruling* 4823, ¶40.  For the Commission, however, the question whether cable broadband Internet providers "offer" telecommunications involved more than whether telecommunications was one necessary component of cable modem service.  Instead, whether that service also includes a telecommunications "offering" "tur[ned] on the nature of the functions the *end user* is offered," *id.*, at 4822, ¶38 (emphasis added), for the statutory definition of "telecommunications service" does not "res[t] on the particular types of facilities used," *id.*, at 4821, ¶35; see §153(46) (definition of "telecommunications service" applies "regardless of the facilities used").

Seen from the consumer's point of view, the Commission concluded, cable modem service is not a telecommunications offering because the consumer uses the high-speed wire always in connection with the information-processing capabilities provided by Internet access, and because the transmission is a necessary component of Internet access: "As provided to the end user the telecommunications is part and parcel of cable modem service and is integral to its other capabilities."  *Declaratory Ruling* 4823, ¶39.  The

wire is used, in other words, to access the World Wide Web, newsgroups, and so forth, rather than "transparently" to transmit and receive ordinary-language messages without computer processing or storage of the message. See *supra*, at 4 (noting the *Computer II* notion of "transparent" transmission). The integrated character of this offering led the Commission to conclude that cable modem service is not a "stand-alone," transparent offering of telecommunications. *Declaratory Ruling* 4823–4825, ¶¶41–43.

### B

This construction passes *Chevron*'s first step. Respondents argue that it does not, on the ground that cable companies providing Internet service necessarily "offe[r]" the underlying telecommunications used to transmit that service. The word "offering" as used in §153(46), however, does not unambiguously require that result. Instead, "offering" can reasonably be read to mean a "stand-alone" offering of telecommunications, *i.e.*, an offered service that, from the user's perspective, transmits messages unadulterated by computer processing. That conclusion follows not only from the ordinary meaning of the word "offering," but also from the regulatory history of the Communications Act.

### 1

Cable companies in the broadband Internet service business "offe[r]" consumers an information service in the form of Internet access and they do so "via telecommunications," §153(20), but it does not inexorably follow as a matter of ordinary language that they also "offe[r]" consumers the high-speed data transmission (telecommunications) that is an input used to provide this service, §153(46). We have held that where a statute's plain terms admit of two or more reasonable ordinary usages, the

Commission's choice of one of them is entitled to defer-
ence.  See *Verizon,* 535 U. S., at 498 (deferring to the
Commission's interpretation of the term "cost" by refer-
ence to an alternative linguistic usage defined by what "[a]
merchant who is asked about 'the cost of providing the
goods'" might "reasonably" say); *National Railroad Pas-
senger Corporation* v. *Boston & Maine Corp.,* 503 U. S.
407, 418 (1992) (agency construction entitled to deference
where there were "alternative dictionary definitions of the
word" at issue).  The term "offe[r]" as used in the defini-
tion of telecommunications service, 47 U. S. C. §153(46), is
ambiguous in this way.

It is common usage to describe what a company "offers"
to a consumer as what the consumer perceives to be the
integrated finished product, even to the exclusion of dis-
crete components that compose the product, as the dissent
concedes.  See *post*, at 3 (opinion of SCALIA, J.).  One might
well say that a car dealership "offers" cars, but does not
"offer" the integrated major inputs that make purchasing
the car valuable, such as the engine or the chassis.  It
would, in fact, be odd to describe a car dealership as "offer-
ing" consumers the car's components in addition to the car
itself.  Even if it is linguistically permissible to say that
the car dealership "offers" engines when it offers cars, that
shows, at most, that the term "offer," when applied to a
commercial transaction, is ambiguous about whether it
describes only the offered finished product, or the prod-
uct's discrete components as well.  It does not show that no
other usage is permitted.

The question, then, is whether the transmission compo-
nent of cable modem service is sufficiently integrated with
the finished service to make it reasonable to describe the
two as a single, integrated offering.  See *ibid.*  We think
that they are sufficiently integrated, because "[a] con-
sumer uses the high-speed wire always in connection with
the information-processing capabilities provided by Inter-

net access, and because the transmission is a necessary component of Internet access." *Supra*, at 16. In the telecommunications context, it is at least reasonable to describe companies as not "offering" to consumers each discrete input that is necessary to providing, and is always used in connection with, a finished service. We think it no misuse of language, for example, to say that cable companies providing Internet service do not "offer" consumers DNS, even though DNS is essential to providing Internet access. *Declaratory Ruling* 4810, n. 74, 4822–4823, ¶38. Likewise, a telephone company "offers" consumers a transparent transmission path that conveys an ordinary-language message, not necessarily the data transmission facilities that also "transmi[t] . . . information of the user's choosing," §153(43), or other physical elements of the facilities used to provide telephone service, like the trunks and switches, or the copper in the wires. What cable companies providing cable modem service and telephone companies providing telephone service "offer" is Internet service and telephone service respectively—the finished services, though they do so using (or "via") the discrete components composing the end product, including data transmission. Such functionally integrated components need not be described as distinct "offerings."

In response, the dissent argues that the high-speed transmission component necessary to providing cable modem service is necessarily "offered" with Internet service because cable modem service is like the offering of pizza delivery service together with pizza, and the offering of puppies together with dog leashes. *Post*, at 3–4 (opinion of SCALIA, J.). The dissent's appeal to these analogies only underscores that the term "offer" is ambiguous in the way that we have described. The entire question is whether the products here are functionally integrated (like the components of a car) or functionally separate (like pets and leashes). That question turns not on the language of

the Act, but on the factual particulars of how Internet technology works and how it is provided, questions *Chevron* leaves to the Commission to resolve in the first instance. As the Commission has candidly recognized, "the question may not always be straightforward whether, on the one hand, an entity is providing a single information service with communications and computing components, or, on the other hand, is providing two distinct services, one of which is a telecommunications service." *Universal Service Report* 11530, ¶60. Because the term "offer" can sometimes refer to a single, finished product and sometimes to the "individual components in a package being offered" (depending on whether the components "still possess sufficient identity to be described as separate objects," *post*, at 3), the statute fails unambiguously to classify the telecommunications component of cable modem service as a distinct offering. This leaves federal telecommunications policy in this technical and complex area to be set by the Commission, not by warring analogies.

We also do not share the dissent's certainty that cable modem service is so obviously like pizza delivery service and the combination of dog leashes and dogs that the Commission could not reasonably have thought otherwise. *Post,* at 3–4. For example, unlike the transmission component of Internet service, delivery service and dog leashes are not integral components of the finished products (pizzas and pet dogs). One can pick up a pizza rather than having it delivered, and one can own a dog without buying a leash. By contrast, the Commission reasonably concluded, a consumer cannot purchase Internet service without also purchasing a connection to the Internet and the transmission always occurs in connection with information processing. In any event, we doubt that a statute that, for example, subjected offerors of "delivery" service (such as Federal Express and United Parcel Service) to

common-carrier regulation would unambiguously require pizza-delivery companies to offer their delivery services on a common carrier basis.

2

The Commission's traditional distinction between basic and enhanced service, see *supra*, at 4–5, also supports the conclusion that the Communications Act is ambiguous about whether cable companies "offer" telecommunications with cable modem service. Congress passed the definitions in the Communications Act against the background of this regulatory history, and we may assume that the parallel terms "telecommunications service" and "information service" substantially incorporated their meaning, as the Commission has held. See, *e.g., In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 9179–9180, ¶788 (1997) (noting that the "definition of enhanced services is substantially similar to the definition of information services" and that "all services previously considered 'enhanced services' are 'information services'"); *Commissioner* v. *Keystone Consol. Industries, Inc.,* 508 U. S. 152, 159 (1993) (noting presumption that Congress is aware of "settled judicial and administrative interpretation[s]" of terms when it enacts a statute). The regulatory history in at least two respects confirms that the term "telecommunications service" is ambiguous.

First, in the *Computer II Order* that established the terms "basic" and "enhanced" services, the Commission defined those terms functionally, based on how the consumer interacts with the provided information, just as the Commission did in the order below. See *supra*, at 4–5. As we have explained, Internet service is not "'transparent in terms of its interaction with customer-supplied information,'" *Computer II Order* 420, ¶96; the transmission occurs in connection with information processing. It was therefore consistent with the statute's terms for the Commis-

sion to assume that the parallel term "telecommunications service" in 47 U. S. C. §153(46) likewise describes a "pure" or "transparent" communications path not necessarily separately present, from the end user's perspective, in an integrated information-service offering.

The Commission's application of the basic/enhanced service distinction to non-facilities-based ISPs also supports this conclusion.  The Commission has long held that "all those who provide some form of transmission services are not necessarily common carriers."  *Computer II Order* 431, ¶122; see also *id.*, at 435, ¶132 ("acknowledg[ing] the existence of a communications component" in enhanced-service offerings).  For example, the Commission did not subject to common-carrier regulation those service providers that offered enhanced services over telecommunications facilities, but that did not themselves own the underlying facilities—so-called "non-facilities-based" providers.  See *Universal Service Report* 11530, ¶60.  Examples of these services included database services in which a customer used telecommunications to access information, such as Dow Jones News and Lexis, as well as "value added networks," which lease wires from common carriers and provide transmission as well as protocol-processing service over those wires.  See *In re Amendment to Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 3 FCC Rcd. 1150, 1153, n. 23 (1988); *supra*, at 4 (explaining protocol conversion).  These services "combin[ed] communications and computing components," yet the Commission held that they should "always be deemed enhanced" and therefore not subject to common-carrier regulation.  *Universal Service Report* 11530, ¶60.  Following this traditional distinction, the Commission in the *Universal Service Report* classified ISPs that leased rather than owned their transmission facilities as pure information-service providers.  *Id.,* at 11540, ¶81.

Respondents' statutory arguments conflict with this

regulatory history. They claim that the Communications Act unambiguously classifies as telecommunications carriers all entities that use telecommunications inputs to provide information service. As respondent MCI concedes, this argument would subject to mandatory common-carrier regulation all information-service providers that use telecommunications as an input to provide information service to the public. Brief for Respondent MCI, Inc. 30. For example, it would subject to common-carrier regulation non-facilities-based ISPs that own no transmission facilities. See *Universal Service Report* 11532–11533, ¶66. Those ISPs provide consumers with transmission facilities used to connect to the Internet, see *supra*, at 2, and so, under respondents' argument, necessarily "offer" telecommunications to consumers. Respondents' position that all such entities are necessarily "offering telecommunications" therefore entails mandatory common-carrier regulation of entities that the Commission never classified as "offerors" of basic transmission service, and therefore common carriers, under the *Computer II* regime.[2] See *Universal Service Report* 11540, ¶81 (noting past Commission policy); *Computer and Communications Industry Assn.* v. *FCC*, 693 F. 2d 198, 209 (CADC 1982) (noting and upholding Commission's *Computer II* "finding that enhanced services . . . are not common carrier services within the scope of Title II"). We doubt that the parallel term "telecommunications service" unambiguously worked

─────────────

[2] The dissent attempts to escape this consequence of respondents' position by way of an elaborate analogy between ISPs and pizzerias. *Post*, at 7–8 (opinion of SCALIA, J.). This analogy is flawed. A pizzeria "delivers" nothing, but ISPs plainly provide transmission service directly to the public in connection with Internet service. For example, with dial-up service, ISPs process the electronic signal that travels over local telephone wires, and transmit it to the Internet. See *supra*, at 2; Huber 988. The dissent therefore cannot deny that its position logically would require applying presumptively mandatory Title II regulation to all ISPs.

this abrupt shift in Commission policy.

Respondents' analogy between cable companies that provide cable modem service and facilities-based enhanced-service providers—that is, enhanced-service providers who own the transmission facilities used to provide those services—fares no better. Respondents stress that under the *Computer II* rules the Commission regulated such providers more heavily than non-facilities-based providers. The Commission required, for example, local telephone companies that provided enhanced services to offer their wires on a common-carrier basis to competing enhanced-service providers. See, *e.g., In re Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 104 F. C. C. 2d 958, 964, ¶4 (1986) (hereinafter *Computer III Order*). Respondents argue that the Communications Act unambiguously requires the same treatment for cable companies because cable companies also own the facilities they use to provide cable modem service (and therefore information service).

We disagree. We think it improbable that the Communications Act unambiguously freezes in time the *Computer II* treatment of facilities-based information-service providers. The Act's definition of "telecommunications service" says nothing about imposing more stringent regulatory duties on facilities-based information-service providers. The definition hinges solely on whether the entity "offer[s] telecommunications for a fee directly to the public," 47 U. S. C. §153(46), though the Act elsewhere subjects facilities-based carriers to stricter regulation, see §251(c) (imposing various duties on facilities-based local telephone companies). In the *Computer II* rules, the Commission subjected facilities-based providers to common-carrier duties not because of the nature of the "offering" made by those carriers, but rather because of the concern that local telephone companies would abuse the monopoly power they possessed by virtue of the "bottleneck" local telephone

facilities they owned. See *Computer II Order* 474–475, ¶¶229, 231; *Computer III Order* 968–969, ¶12; *Verizon*, 535 U. S., at 489–490 (describing the naturally monopolistic physical structure of a local telephone exchange). The differential treatment of facilities-based carriers was therefore a function not of the definitions of "enhanced-service" and "basic service," but instead of a choice by the Commission to regulate more stringently, in its discretion, certain entities that provided enhanced service. The Act's definitions, however, parallel the definitions of enhanced and basic service, not the facilities-based grounds on which that policy choice was based, and the Commission remains free to impose special regulatory duties on facilities-based ISPs under its Title I ancillary jurisdiction. In fact, it has invited comment on whether it can and should do so. See *supra*, at 7.

In sum, if the Act fails unambiguously to classify non-facilities-based information-service providers that use telecommunications inputs to provide an information service as "offer[ors]" of "telecommunications," then it also fails unambiguously to classify facilities-based information-service providers as telecommunications-service offerors; the relevant definitions do not distinguish facilities-based and non-facilities-based carriers. That silence suggests, instead, that the Commission has the discretion to fill the consequent statutory gap.

C

We also conclude that the Commission's construction was "a reasonable policy choice for the [Commission] to make" at *Chevron*'s second step. 467 U. S., at 845.

Respondents argue that the Commission's construction is unreasonable because it allows any communications provider to "evade" common-carrier regulation by the expedient of bundling information service with telecommunications. Respondents argue that under the Commis-

sion's construction a telephone company could, for example, offer an information service like voice mail together with telephone service, thereby avoiding common-carrier regulation of its telephone service.

We need not decide whether a construction that resulted in these consequences would be unreasonable because we do not believe that these results follow from the construction the Commission adopted. As we understand the *Declaratory Ruling*, the Commission did not say that any telecommunications service that is priced or bundled with an information service is automatically unregulated under Title II. The Commission said that a telecommunications input used to provide an information service that is not "separable from the data-processing capabilities of the service" and is instead "part and parcel of [the information service] and is integral to [the information service's] other capabilities" is not a telecommunications offering. *Declaratory Ruling* 4823, ¶39; see *supra*, at 16–17.

This construction does not leave all information service offerings exempt from mandatory Title II regulation. "It is plain," for example, that a local telephone company "cannot escape Title II regulation of its residential local exchange service simply by packaging that service with voice mail." *Universal Service Report* 11530, ¶60. That is because a telephone company that packages voice mail with telephone service offers a transparent transmission path—telephone service—that transmits information independent of the information-storage capabilities provided by voice mail. For instance, when a person makes a telephone call, his ability to convey and receive information using the call is only trivially affected by the additional voice-mail capability. Equally, were a telephone company to add a time-of-day announcement that played every time the user picked up his telephone, the "transparent" information transmitted in the ensuing call would be only trivially dependent on the information service the an-

nouncement provides. By contrast, the high-speed transmission used to provide cable modem service is a functionally integrated component of that service because it transmits data only in connection with the further processing of information and is necessary to provide Internet service. The Commission's construction therefore was more limited than respondents assume.

Respondents answer that cable modem service does, in fact, provide "transparent" transmission from the consumer's perspective, but this argument, too, is mistaken. Respondents characterize the "information-service" offering of Internet access as consisting only of access to a cable company's e-mail service, its Web page, and the ability it provides consumers to create a personal Web page. When a consumer goes beyond those offerings and accesses content provided by parties other than the cable company, respondents argue, the consumer uses "pure transmission" no less than a consumer who purchases phone service together with voice mail.

This argument, we believe, conflicts with the Commission's understanding of the nature of cable modem service, an understanding we find to be reasonable. When an end user accesses a third-party's Web site, the Commission concluded, he is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company's own Web site, its e-mail service, or his personal Web page. For example, as the Commission found below, part of the information service cable companies provide is access to DNS service. See *supra*, at 15–16. A user cannot reach a third-party's Web site without DNS, which (among other things) matches the Web site address the end user types into his browser (or "clicks" on with his mouse) with the IP address of the Web page's host server. See P. Albitz & C. Liu, DNS and BIND 10 (4th ed. 2001) (For an Internet user, "DNS is a must. . . . [N]early all of the Internet's network services

use DNS. That includes the World Wide Web, electronic
mail, remote terminal access, and file transfer"). It is at
least reasonable to think of DNS as a "capability for . . .
acquiring . . . retrieving, utilizing, or making available"
Web site addresses and therefore part of the information
service cable companies provide. 47 U. S. C. §153(20).[3]
Similarly, the Internet service provided by cable compa-
nies facilitates access to third-party Web pages by offering
consumers the ability to store, or "cache," popular content
on local computer servers. See *Declaratory Ruling* 4810,
¶17, and n. 76. Cacheing obviates the need for the end
user to download anew information from third-party Web
sites each time the consumer attempts to access them,
thereby increasing the speed of information retrieval. In
other words, subscribers can reach third-party Web sites
via "the World Wide Web, and browse their contents,
[only] because their service provider offers the 'capability
for . . . acquiring, [storing] . . . retrieving [and] utilizing . . .
information.'" *Universal Service Report* 11538, ¶76 (quot-
ing 47 U. S. C. §153(20)). "The service that Internet access
providers offer to members of the public is Internet ac-
cess," *Universal Service Report* 11539, ¶79, not a trans-
parent ability (from the end user's perspective) to transmit
information. We therefore conclude that the Commission's

---

[3] The dissent claims that access to DNS does not count as use of the
information-processing capabilities of Internet service because DNS is
"scarcely more than routing information, which is expressly excluded
from the definition of 'information service.'" *Post*, at 9, and n. 6 (opin-
ion of SCALIA, J.). But the definition of information service does not
exclude "routing information." Instead, it excludes "any use of any such
capability for the management, control, or operation of a telecommuni-
cations system or the management of a telecommunications service."
47 U. S. C. §153(20). The dissent's argument therefore begs the ques-
tion because it assumes that Internet service is a "telecommunications
system" or "service" that DNS manages (a point on which, contrary to
the dissent's assertion, *post*, at 9, n. 6, we need take no view for pur-
poses of this response).

construction was reasonable.

## V

Respondent MCI, Inc., urges that the Commission's treatment of cable modem service is inconsistent with its treatment of DSL service, see *supra*, at 3 (describing DSL service), and therefore is an arbitrary and capricious deviation from agency policy. See 5 U. S. C. §706(2)(A). MCI points out that when local telephone companies began to offer Internet access through DSL technology in addition to telephone service, the Commission applied its *Computer II* facilities-based classification to them and required them to make the telephone lines used to transmit DSL service available to competing ISPs on nondiscriminatory, common-carrier terms. See *supra*, at 24 (describing *Computer II* facilities-based classification of enhanced-service providers); *In re Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd. 24011, 24030–24031, ¶¶36–37 (1998) (hereinafter *Wireline Order*) (classifying DSL service as a telecommunications service). MCI claims that the Commission's decision not to regulate cable companies similarly under Title II is inconsistent with its DSL policy.

We conclude, however, that the Commission provided a reasoned explanation for treating cable modem service differently from DSL service. As we have already noted, see *supra*, at 9–10, the Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change.[4] It has done so here. The

---

[4] Respondents vigorously argue that the Commission's purported inconsistent treatment is a reason for holding the Commission's construction impermissible under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). Any inconsistency bears on whether the Commission has given a reasoned explanation for its current position, not on whether its interpretation is consistent with the statute.

traditional reason for its *Computer II* common-carrier treatment of facilities-based carriers (including DSL carriers), as the Commission explained, was "that the *telephone network* [was] the primary, if not exclusive, means through which information service providers can gain access to their customers." *Declaratory Ruling* 4825, ¶44 (emphasis in original; internal quotation marks omitted). The Commission applied the same treatment to DSL service based on that history, rather than on an analysis of contemporaneous market conditions. See *Wireline Order* 24031, ¶37 (noting DSL carriers' "continuing obligation" to offer their transmission facilities to competing ISPs on nondiscriminatory terms).

The Commission in the order under review, by contrast, concluded that changed market conditions warrant different treatment of facilities-based cable companies providing Internet access. Unlike at the time of *Computer II*, substitute forms of Internet transmission exist today: "[R]esidential high-speed access to the Internet is evolving over multiple electronic platforms, including wireline, cable, terrestrial wireless and satellite." *Declaratory Ruling* 4802, ¶6; see also *U. S. Telecom Assn.* v. *FCC*, 290 F. 3d 415, 428 (CADC 2002) (noting Commission findings of "robust competition . . . in the broadband market"). The Commission concluded that "'broadband services should exist in a minimal regulatory environment that promotes investment and innovation in a competitive market.'" *Declaratory Ruling* 4802, ¶5. This, the Commission reasoned, warranted treating cable companies unlike the facilities-based enhanced-service providers of the past. *Id.*, at 4825, ¶44. We find nothing arbitrary about the Commission's providing a fresh analysis of the problem as applied to the cable industry, which it has never subjected to these rules. This is adequate rational justification for the Commission's conclusions.

Respondents argue, in effect, that the Commission's

justification for exempting cable modem service providers from common-carrier regulation applies with similar force to DSL providers. We need not address that argument. The Commission's decision appears to be a first step in an effort to reshape the way the Commission regulates information-service providers; that may be why it has tentatively concluded that DSL service provided by facilities-based telephone companies should also be classified solely as an information service. See *In re Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 17 FCC Rcd. 3019, 3030, ¶20 (2002). The Commission need not immediately apply the policy reasoning in the *Declaratory Ruling* to all types of information-service providers. It apparently has decided to revisit its longstanding *Computer II* classification of facilities-based information-service providers incrementally. Any inconsistency between the order under review and the Commission's treatment of DSL service can be adequately addressed when the Commission fully reconsiders its treatment of DSL service and when it decides whether, pursuant to its ancillary Title I jurisdiction, to require cable companies to allow independent ISPs access to their facilities. See *supra*, at 7, this page. We express no view on those matters. In particular, we express no view on how the Commission should, or lawfully may, classify DSL service.

\*    \*    \*

The questions the Commission resolved in the order under review involve a "subject matter [that] is technical, complex, and dynamic." *Gulf Power*, 534 U. S., at 339. The Commission is in a far better position to address these questions than we are. Nothing in the Communications Act or the Administrative Procedure Act makes unlawful the Commission's use of its expert policy judgment to resolve these difficult questions. The judgment of the

Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 04–277 and 04–281

---

NATIONAL CABLE & TELECOMMUNICATIONS
ASSOCIATION, ET AL., PETITIONERS
04–277                    *v.*
BRAND X INTERNET SERVICES ET AL.


FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES, PETITIONERS
04–281                    *v.*
BRAND X INTERNET SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE STEVENS, concurring.

While I join the Court's opinion in full, I add this caveat concerning Part III–B, which correctly explains why a court of appeals' interpretation of an ambiguous provision in a regulatory statute does not foreclose a contrary reading by the agency. That explanation would not necessarily be applicable to a decision by this Court that would presumably remove any pre-existing ambiguity.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 04–277 and 04–281

---

NATIONAL CABLE & TELECOMMUNICATIONS
ASSOCIATION, ET AL., PETITIONERS
04–277                    *v.*
BRAND X INTERNET SERVICES ET AL.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES, PETITIONERS
04–281                    *v.*
BRAND X INTERNET SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE BREYER, concurring.

I join the Court's opinion because I believe that the
Federal Communications Commission's decision falls
within the scope of its statutorily delegated authority—
though perhaps just barely. I write separately because I
believe it important to point out that JUSTICE SCALIA, in
my view, has wrongly characterized the Court's opinion in
*United States* v. *Mead Corp.,* 533 U. S. 218 (2001). He
states that the Court held in *Mead* that "some unspecified
degree of formal process" before the agency "was required"
for courts to accord the agency's decision deference under
*Chevron U. S. A. Inc.* v. *Natural Resources Defense Council,
Inc.,* 467 U. S. 837 (1984). *Post*, at 12 (dissenting opinion);
see also *ibid.* (formal process is "at least the only safe
harbor").

JUSTICE SCALIA has correctly characterized the way in
which he, *in dissent*, characterized the Court's *Mead* opin-

ion. 533 U. S., at 245–246. But the Court said the opposite. An agency action qualifies for *Chevron* deference when Congress has explicitly or implicitly delegated to the agency the authority to "fill" a statutory "gap," including an interpretive gap created through an ambiguity in the language of a statute's provisions. *Chevron, supra,* at 843–844; *Mead, supra*, at 226–227. The Court said in *Mead* that such delegation "may be shown *in a variety of ways, as by* an agency's power to engage in adjudication or notice-and-comment rulemaking, *or by some other indication of a comparable congressional intent.*" 533 U. S., at 227 (emphasis added). The Court explicitly stated that the absence of notice-and-comment rulemaking did "not decide the case," for the Court has "sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." *Id.*, at 231. And the Court repeated that it "has recognized *a variety of indicators* that Congress would expect *Chevron* deference." *Id.*, at 237 (emphasis added).

It is not surprising that the Court would hold that the existence of a formal rulemaking proceeding is neither a necessary nor a sufficient condition for according *Chevron* deference to an agency's interpretation of a statute. It is not a necessary condition because an agency might arrive at an authoritative interpretation of a congressional enactment in other ways, including ways that JUSTICE SCALIA mentions. See, *e.g., Mead, supra,* at 231. It is not a sufficient condition because Congress may have intended *not* to leave the matter of a particular interpretation up to the agency, irrespective of the procedure the agency uses to arrive at that interpretation, say, where an unusually basic legal question is at issue. Cf. *General Dynamics Land Systems, Inc.* v. *Cline,* 540 U. S. 581, 600 (2004) (rejecting agency's answer to question whether age discrimination law forbids discrimination against the relatively young).

BREYER, J., concurring

Thus, while I believe JUSTICE SCALIA is right in emphasizing that *Chevron* deference may be appropriate in the absence of formal agency proceedings, *Mead* should not give him cause for concern.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 04–277 and 04–281

————

NATIONAL CABLE & TELECOMMUNICATIONS
ASSOCIATION, ET AL., PETITIONERS
04–277                              *v.*
BRAND X INTERNET SERVICES ET AL.


FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES, PETITIONERS
04–281                              *v.*
BRAND X INTERNET SERVICES ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE SCALIA, with whom JUSTICE SOUTER and
JUSTICE GINSBURG join as to Part I, dissenting.

The Federal Communications Commission (FCC or
Commission) has once again attempted to concoct "a whole
new regime of regulation (or of free-market competition)"
under the guise of statutory construction. *MCI Telecom-*
*munications Corp.* v. *American Telephone & Telegraph*
*Co.,* 512 U. S. 218, 234 (1994). Actually, in these cases, it
might be more accurate to say the Commission has at-
tempted to establish a whole new regime of *non*-
regulation, which will make for more or less free-market
competition, depending upon whose experts are believed.
The important fact, however, is that the Commission has
chosen to achieve this through an implausible reading of
the statute, and has thus exceeded the authority given it
by Congress.

I

The first sentence of the FCC ruling under review reads as follows: "Cable modem service provides high-speed access to the Internet, *as well as* many applications or functions that can be used with that access, over cable system facilities." *In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities,* 17 FCC Rcd. 4798, 4799, ¶1 (2002) (hereinafter *Declaratory Ruling*) (emphasis added, footnote omitted). Does this mean that cable companies "offer" high-speed access to the Internet? Surprisingly not, if the Commission and the Court are to be believed.

It happens that cable-modem service is popular precisely because of the high-speed access it provides, and that, once connected with the Internet, cable-modem subscribers often use Internet applications and functions from providers other than the cable company. Nevertheless, for purposes of classifying what the cable company does, the Commission (with the Court's approval) puts all the emphasis on the rest of the package (the additional "applications or functions"). It does so by claiming that the cable company does not "offe[r]" its customers high-speed Internet access because it offers that access only in conjunction with particular applications and functions, rather than "separate[ly]," as a "stand-alone offering." *Id.,* at 4802, ¶7, 4823, ¶40.

The focus on the term "offer" appropriately derives from the statutory definitions at issue in these cases. Under the Telecommunications Act of 1996, 110 Stat. 56, "'information service'" involves the capacity to generate, store, interact with, or otherwise manipulate "information via telecommunications." 47 U. S. C. §153(20). In turn, "'telecommunications'" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." §153(43).

Finally, "'telecommunications service'" is defined as "the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used." §153(46). The question here is whether cable-modem-service providers "offe[r] . . . telecommunications for a fee directly to the public." If so, they are subject to Title II regulation as common carriers, like their chief competitors who provide Internet access through other technologies.

The Court concludes that the word "offer" is ambiguous in the sense that it has "'alternative dictionary definitions'" that might be relevant. *Ante,* at 18 (quoting *National Railroad Passenger Corporation* v. *Boston & Maine Corp.,* 503 U. S. 407, 418 (1992)). It seems to me, however, that the analytic problem pertains not really to the meaning of "offer," but to the identity of what is offered. The relevant question is whether the individual components in a package being offered still possess sufficient identity to be described as separate objects of the offer, or whether they have been so changed by their combination with the other components that it is no longer reasonable to describe them in that way.

Thus, I agree (to adapt the Court's example, *ante,* at 18) that it would be odd to say that a car dealer is in the business of selling steel or carpets because the cars he sells include both steel frames and carpeting. Nor does the water company sell hydrogen, nor the pet store water (though dogs and cats are largely water at the molecular level). But what is sometimes true is not, as the Court seems to assume, *always* true. There are instances in which it is ridiculous to deny that one part of a joint offering is being offered merely because it is not offered on a "'stand-alone'" basis, *ante,* at 17.

If, for example, I call up a pizzeria and ask whether they offer delivery, both common sense and common "usage," *ante,* at 18, would prevent them from answering: "No, we do not offer delivery—but if you order a pizza from us,

we'll bake it for you and then bring it to your house." The
logical response to this would be something on the order
of, "so, you *do* offer delivery." But our pizza-man may
continue to deny the obvious and explain, paraphrasing
the FCC and the Court: "No, even though we bring the
pizza to your house, we are not actually 'offering' you
delivery, because the delivery that we provide to our end
users is 'part and parcel' of our pizzeria-pizza-at-home
service and is 'integral to its other capabilities.'" Cf. *De-
claratory Ruling* 4823, ¶39; *ante,* at 16, 26.[1] Any reason-
able customer would conclude at that point that his inter-
locutor was either crazy or following some too-clever-by-
half legal advice.

In short, for the inputs of a finished service to qualify as
the objects of an "offer" (as that term is reasonably under-
stood), it is perhaps a sufficient, *but surely not a necessary,*
condition that the seller offer separately "each discrete
input that is necessary to providing . . . a finished service,"
*ante,* at 19. The pet store may have a policy of selling
puppies only with leashes, but any customer will say that
it *does* offer puppies—because a leashed puppy is still a
puppy, even though it is not offered on a "stand-alone"
basis.

Despite the Court's mighty labors to prove otherwise,
*ante,* at 17–29, the telecommunications component of
cable-modem service retains such ample independent
identity that it must be regarded as being on offer—
especially when seen from the perspective of the consumer
or the end user, which the Court purports to find determi-
native, *ante,* at 18, 22, 27, 28. The Commission's ruling
began by noting that cable-modem service provides *both*

---

[1] The myth that the pizzeria does not offer delivery becomes even
more difficult to maintain when the pizzeria advertises quick delivery
as one of its advantages over competitors. That, of course, is the case
with cable broadband.

"high-speed access to the Internet" *and* other "applications and functions," *Declaratory Ruling* 4799, ¶1, because that is exactly how any reasonable consumer would perceive it: as consisting of two separate things.

The consumer's view of the matter is best assessed by asking what other products cable-modem service substitutes for in the marketplace. Broadband Internet service provided by cable companies is one of the three most common forms of Internet service, the other two being dial-up access and broadband Digital Subscriber Line (DSL) service. *Ante,* at 2–3. In each of the other two, the physical transmission pathway to the Internet is sold— indeed, *is legally required* to be sold—separately from the Internet functionality. With dial-up access, the physical pathway comes from the telephone company and the Internet service provider (ISP) provides the functionality.

> "In the case of Internet access, the end user utilizes two different and distinct services. One is the transmission pathway, a telecommunications service that the end user purchases from the telephone company. The second is the Internet access service, which is an enhanced service provided by an ISP. . . . Th[e] functions [provided by the ISP] are separate from the transmission pathway over which that data travels. The pathway is a regulated telecommunications service; the enhanced service offered over it is not." Oxman, The FCC and the Unregulation of the Internet, p. 13 (FCC, Office of Plans and Policy, Working Paper No. 31, July 1999), available at http://www.fcc.gov/ Bureaus/OPP/working_papers/oppwp31.pdf (as visited June 24, 2005, and available in the Clerk of Court's case file).[2]

---

[2] See also *In re Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11571–11572, ¶145 (1998) (end users "obtain telecommunications service from local exchange carriers, and then use

As the Court acknowledges, *ante,* at 29, DSL service has
been similar to dial-up service in the respect that the
physical connection to the Internet must be offered sepa-
rately from Internet functionality.[3]    Thus, customers
shopping for dial-up or DSL service will not be able to use
the Internet unless they get both someone to provide them
with a physical connection and someone to provide them
with applications and functions such as e-mail and Web
access.    It is therefore inevitable that customers will re-
gard the competing cable-modem service as giving them
*both* computing functionality *and* the physical pipe by
which that functionality comes to their computer—both
the pizza and the delivery service that nondelivery pizze-
rias require to be purchased from the cab company.[4]

Since the delivery service provided by cable (the broad-
band connection between the customer's computer and the
cable company's computer-processing facilities) is down-
stream from the computer-processing facilities, there is no
question that it merely serves as a conduit for the infor-
mation services that have already been "assembled" by the

_____

information services provided by their Internet service provider and
[Web site operators] in order to access [the Web]").

[3] In the DSL context, the physical connection is generally resold to
the consumer by an ISP that has taken advantage of the telephone
company's offer.    The consumer knows very well, however, that the
physical connection is a necessary component for Internet access which,
just as in the dial-up context, is not provided by the ISP.

[4] The Court contends that this analogy is inapposite because one need
not have a pizza delivered, *ante,* at 20, whereas one must purchase the
cable connection in order to use cable's ISP functions.    But the ISP
functions provided by the cable company *can* be used without cable
delivery—by accessing them from an Internet connection other than
cable.    The merger of the physical connection and Internet functions in
cable's offerings has nothing to do with the "'inextricably intertwined,'"
*ante,* at 6, nature of the two (like a car and its carpet), but is an artifi-
cial product of the cable company's marketing decision not to offer the
two separately, so that the Commission could (by the *Declaratory
Ruling* under review here) exempt it from common-carrier status.

cable company in its capacity as ISP. This is relevant because of the statutory distinction between an "information service" and "telecommunications." The former involves the capability of getting, processing, and manipulating information. §153(20). The latter, by contrast, involves no "change in the form or content of the information as sent and received." §153(43). When cable-company-assembled information enters the cable for delivery to the subscriber, the information service is already complete. The information has been (as the statute requires) generated, acquired, stored, transformed, processed, retrieved, utilized, or made available. All that remains is for the information in its final, unaltered form, to be delivered (via telecommunications) to the subscriber.

This reveals the insubstantiality of the fear invoked by both the Commission and the Court: the fear of what will happen to ISPs that do not provide the physical pathway to Internet access, yet still use telecommunications to acquire the pieces necessary to assemble the information that they pass back to their customers. According to this *reductio, ante,* at 22–24, if cable-modem-service providers are deemed to provide "telecommunications service," then so must *all* ISPs because they all "use" telecommunications in providing Internet functionality (by connecting to other parts of the Internet, including Internet backbone providers, for example). In terms of the pizzeria analogy, this is equivalent to saying that, if the pizzeria "offers" delivery, *all* restaurants "offer" delivery, because the ingredients of the food they serve their customers have come from other places; no matter how their customers get the food (whether by eating it at the restaurant, or by coming to pick it up themselves), they still consume a product for which delivery was a necessary "input." This is nonsense. Concluding that delivery of the finished pizza constitutes an "offer" of delivery does not require the conclusion that the serving of prepared food includes an

"offer" of delivery. And that analogy does not even do the point justice, since "'telecommunications service'" is defined as "the offering of telecommunications for a fee *directly to the public."* 47 U. S. C. §153(46) (emphasis added). The ISPs' use of telecommunications in their processing of information is not offered directly to the public.

The "regulatory history" on which the Court depends so much, *ante,* at 21–25, provides another reason why common-carrier regulation of all ISPs is not a worry. Under its *Computer Inquiry* rules, which foreshadowed the definitions of "information" and "telecommunications" services, *ante,* at 4–5, the Commission forbore from regulating as common carriers "value-added networks"—nonfacilities-based providers who leased basic services from common carriers and bundled them with enhanced services; it said that they, unlike facilities-based providers, would be deemed to provide only enhanced services, *ante,* at 22.[5] That same result can be achieved today under the Commission's statutory authority to forbear from imposing

_____

[5] The Commission says forbearance cannot explain why value-added networks were not regulated as basic-service providers because it was not given the power to forbear until 1996. Reply Brief for Federal Petitioners 3–4, n. 1. It is true that when the Commission ruled on value-added networks, the statute did not explicitly provide for forbearance—any more than it provided for the categories of basic and enhanced services that the *Computer Inquiry* rules established, and through which the forbearance was applied. The D. C. Circuit, however, had long since recognized the Commission's discretionary power to "forbear from Title II regulation." *Computer & Communications Industry Assn.* v. *FCC,* 693 F. 2d 198, 212 (1982).

The Commission also says its *Computer Inquiry* rules should not apply to cable because they were developed in the context of telephone lines. Brief for Federal Petitioners 35–36; see also *ante,* at 24–25. But to the extent that the statute imported the *Computer Inquiry* approach, there is no basis for applying it differently to cable than to telephone lines, since the definition of "telecommunications service" applies "regardless of the facilities used." 47 U. S. C. §153(46).

most Title II regulations. 47 U. S. C. §160. In fact, the statutory criteria for forbearance—which include what is "just and reasonable," "necessary for the protection of consumers," and "consistent with the public interest," §§160(a)(1), (2), (3)—correspond well with the kinds of policy reasons the Commission has invoked to justify its peculiar construction of "telecommunications service" to exclude cable-modem service.

The Court also puts great stock in its conclusion that cable-modem subscribers cannot avoid using information services provided by the cable company in its ISP capacity, even when they only click-through to other ISPs. *Ante,* at 27–29. For, even if a cable-modem subscriber uses e-mail from another ISP, designates some page not provided by the cable company as his home page, and takes advantage of none of the other standard applications and functions provided by the cable company, he will still be using the cable company's Domain Name System (DNS) server and, when he goes to popular Web pages, perhaps versions of them that are stored in the cable company's cache. This argument suffers from at least two problems. First, in the context of telephone services, the Court recognizes a *de minimis* exception to contamination of a telecommunications service by an information service. *Ante,* at 26–27. A similar exception would seem to apply to the functions in question here. DNS, in particular, is scarcely more than routing information, which is expressly excluded from the definition of "information service." 47 U. S. C. §153(20).[6]

---

[6] The Court says that invoking this explicit exception from the definition of information services, which applies only to the "management, control, or operation of a telecommunications system or the management of a telecommunications service," 47 U. S. C. §153(20), begs the question whether cable-modem service includes a telecommunications service, *ante,* at 28, n. 3. I think not, and cite the exception only to demonstrate that the incidental functions do not *prevent* cable from including a telecommunications service *if it otherwise qualifies.* It is

Second, it is apparently possible to sell a telecommunications service separately from, although in conjunction with, ISP-like services; that is precisely what happens in the DSL context, and the Commission does not contest that it *could* be done in the context of cable. The only impediment appears to be the Commission's failure to require from cable companies the unbundling that it required of facilities-based providers under its *Computer Inquiry*.

Finally, I must note that, notwithstanding the Commission's self-congratulatory paean to its deregulatory largesse, *e.g.,* Brief for Federal Petitioners 29–32, it concluded the *Declaratory Ruling* by asking, as the Court paraphrases, "whether under its Title I jurisdiction [the Commission] should require cable companies to offer other ISPs access to their facilities on common-carrier terms." *Ante,* at 7; see also Reply Brief for Federal Petitioners 9; Tr. of Oral Arg. 17. In other words, what the Commission hath given, the Commission may well take away—unless it doesn't. This is a wonderful illustration of how an experienced agency can (with some assistance from credulous courts) turn statutory constraints into bureaucratic discretions. The main source of the Commission's regulatory authority over common carriers is Title II, but the Commission has rendered that inapplicable in this instance by concluding that the definition of "telecommunications service" is ambiguous and does not (in its current view) apply to cable-modem service. It contemplates, however, altering that (unnecessary) outcome, not by changing the law (*i.e.,* its construction of the Title II definitions), but by reserving the right to change the facts. Under its undefined and sparingly used "ancillary" powers, the Commission might conclude that it can order cable

---

rather the Court that begs the question, saying that the exception cannot apply because cable is not a telecommunications service.

companies to "unbundle" the telecommunications compo-
nent of cable-modem service.[7]  And presto, Title II will
then apply to them, because they will finally be "offering"
telecommunications service!  Of course, the Commission
will still have the statutory power to forbear from regulat-
ing them under §160 (which it has already tentatively
concluded it would do, *Declaratory Ruling* 4847–4848,
¶¶94–95).  Such Möbius-strip reasoning mocks the princi-
ple that the statute constrains the agency in any meaning-
ful way.

After all is said and done, after all the regulatory cant
has been translated, and the smoke of agency expertise
blown away, it remains perfectly clear that someone who
sells cable-modem service is "offering" telecommunica-
tions.  For that simple reason set forth in the statute, I
would affirm the Court of Appeals.

## II

In Part III–B of its opinion, the Court continues the
administrative-law improvisation project it began four
years ago in *United States* v. *Mead Corp.,* 533 U. S. 218
(2001).  To the extent it set forth a comprehensible rule,[8]
*Mead* drastically limited the categories of agency action
that would qualify for deference under *Chevron U. S. A.
Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S.

---

[7] Under the Commission's assumption that cable-modem-service pro-
viders are not providing "telecommunications services," there is reason
to doubt whether it can use its Title I powers to impose common-
carrier-like requirements, since 47 U. S. C. §153(44) specifically pro-
vides that a "telecommunications carrier shall be treated as a common
carrier under this chapter *only to the extent* that it is engaged in provid-
ing telecommunications services" (emphasis added), and "this chapter"
includes Titles I and II.

[8] For a description of the confusion *Mead* has produced in the D. C.
Circuit alone, see Vermeule, *Mead* in the Trenches, 71 Geo. Wash.
L. Rev. 347, 361 (2003) (concluding that "the Court has inadvertently
sent the lower courts stumbling into a no-man's land").

837 (1984). For example, the position taken by an agency before the Supreme Court, with full approval of the agency head, would not qualify. Rather, some unspecified degree of formal process was required—or was at least the only safe harbor. See *Mead, supra,* at 245–246 (SCALIA, J., dissenting).[9]

This meant that many more issues appropriate for agency determination would reach the courts without benefit of an agency position entitled to *Chevron* deference, requiring the courts to rule on these issues *de novo.*[10] As I pointed out in dissent, this in turn meant (under the law as it was understood until today)[11] that many statu-

_____

[9] JUSTICE BREYER attempts to clarify *Mead* by repeating its formulations that the Court has "sometimes found reasons" to give *Chevron* deference in a (still-unspecified) "variety of ways" or because of a (still-unspecified) "variety of indicators," *ante,* at 2 (concurring opinion) (internal quotation marks and emphasis omitted). He also notes that deference is sometimes inappropriate for reasons unrelated to the agency's process. Surprising those who thought the Court's decision not to defer to the agency in *General Dynamics Land Systems, Inc.* v. *Cline,* 540 U. S. 581 (2004), depended on its conclusion that there was "no serious question . . . about purely textual ambiguity" in the statute, *id.,* at 600, JUSTICE BREYER seemingly attributes that decision to a still-underdeveloped exception to *Chevron* deference—one for "unusually basic legal question[s]," *ante,* at 2. The Court today (thankfully) does not follow this approach: It bases its decision on what it sees as statutory ambiguity, *ante,* at 25, without asking whether the classification of cable-modem service is an "unusually basic legal question."

[10] It is true that, even under the broad basis for deference that I propose (viz., any agency position that plainly has the approval of the agency head, see *United States* v. *Mead Corp.,* 533 U. S. 218, 256–257 (2001) (SCALIA, J., dissenting)), some interpretive matters will be decided *de novo,* without deference to agency views. This would be a rare occurrence, however, at the Supreme Court level—at least with respect to matters of any significance to the agency. Seeking to achieve 100% agency control of ambiguous provisions through the complicated method the Court proposes is not worth the incremental benefit.

[11] The Court's unanimous holding in *Neal* v. *United States,* 516 U. S. 284 (1996), plainly rejected the notion that any form of deference could cause the Court to revisit a prior statutory-construction holding: "Once

tory ambiguities that might be resolved in varying fashions by successive agency administrations, would be resolved finally, conclusively, and forever, by federal judges—producing an "ossification of large portions of our statutory law," 533 U. S., at 247. The Court today moves to solve this problem of its own creation by inventing yet another breathtaking novelty: judicial decisions subject to reversal by Executive officers.

Imagine the following sequence of events: FCC action is challenged as ultra vires under the governing statute; the litigation reaches all the way to the Supreme Court of the United States. The Solicitor General sets forth the FCC's official position (approved by the Commission) regarding interpretation of the statute. Applying *Mead,* however, the Court denies the agency position *Chevron* deference, finds that the *best* interpretation of the statute contradicts the agency's position, and holds the challenged agency action unlawful. The agency promptly conducts a rule-making, and adopts a rule that comports with its earlier position—in effect disagreeing with the Supreme Court concerning the best interpretation of the statute. Accord-

───────────

we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis,* and we assess an agency's later interpretation of the statute against that settled law." *Id.,* at 295. The Court attempts to reinterpret this plain language by dissecting the cases *Neal* cited, noting that they referred to previous determinations of "'a statute's clear meaning.'" *Lechmere, Inc.* v. *NLRB,* 502 U. S. 527, 537 (1992) (quoting *Maislin Industries, U. S., Inc.* v. *Primary Steel, Inc.,* 497 U. S. 116, 131 (1990)). But those cases reveal that today's focus on the term "clear" is revisionist. The oldest case in the chain using that word, *Maislin Industries,* did not rely on a prior decision that held the statute to be clear, but on a run-of-the-mill statutory interpretation contained in a 1908 decision. *Id.,* at 130–131. When *Maislin Industries* referred to the Court's prior determination of "a statute's clear meaning," it was referring to the fact that the prior decision had made the statute clear, and was not conducting a retrospective inquiry into whether the prior decision had declared the statute itself to be clear on its own terms.

ing to today's opinion, the agency is thereupon free to take the action that the Supreme Court found unlawful.

This is not only bizarre. It is probably unconstitutional. As we held in *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103 (1948), Article III courts do not sit to render decisions that can be reversed or ignored by Executive officers. In that case, the Court of Appeals had determined it had jurisdiction to review an order of the Civil Aeronautics Board awarding an overseas air route. By statute such orders were subject to Presidential approval and the order in question had in fact been approved by the President. *Id.,* at 110–111. In order to avoid any conflict with the President's foreign-affairs powers, the Court of Appeals concluded that it would review the board's action "as a regulatory agent of Congress," and the results of that review would remain subject to approval or disapproval by the President. *Id.,* at 112–113. As I noted in my *Mead* dissent, 533 U. S., at 248, the Court bristled at the suggestion: "Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government." *Waterman, supra,* at 113. That is what today's decision effectively allows. Even when the agency itself is party to the case in which the Court construes a statute, the agency will be able to disregard that construction and seek *Chevron* deference for its contrary construction the next time around.[12]

───────────

[12] The Court contends that no reversal of judicial holdings is involved, because "a court's opinion as to the best reading of an ambiguous statute . . . is not authoritative," *ante,* at 11. That fails to appreciate the difference between a *de novo* construction of a statute and a decision whether to defer to an agency's position, which does not even "*purport* to give the statute a judicial interpretation." *Mead, supra,* at 248 (SCALIA, J., dissenting). Once a court has decided upon its *de novo* construction of the statute, there no longer is a "different construction"

Of course, like *Mead* itself, today's novelty in belated remediation of *Mead* creates many uncertainties to bedevil the lower courts. A court's interpretation is conclusive, the Court says, only if it holds that interpretation to be "the *only permissible* reading of the statute," and not if it merely holds it to be "the *best* reading." *Ante,* at 13. Does this mean that in future statutory-construction cases involving agency-administered statutes courts must specify (presumably in dictum) which of the two they are holding? And what of the many cases decided in the past, before this dictum's requirement was established? Apparently, silence on the point means that the court's decision is subject to agency reversal: "Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction."[13] *Ibid.* (I have not made, and as far as I know the Court has not made, any calculation of how many hundreds of past statutory decisions are now agency-reversible because of failure to include an "unambiguous" finding. I suspect the number is very large.) How much extra work will it entail for each court confronted with an agency-administered statute to determine whether it has reached, not only the right ("best") result, but "the only permissible" result? Is the standard for "unambiguous" under the Court's new agency-reversal rule the same as the standard for "unambiguous" under step one of *Chev-*

---

that is "consistent with the court's holding," *ante,* at 11, and available for adoption by the agency.

[13] Suggestive of the same chaotic undermining of all prior judicial decisions that do not explicitly renounce ambiguity is the Court's explanation of why agency departure from a prior judicial decision does not amount to overruling: "[T]he agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of [ambiguous] statutes [it is charged with administering]." *Ante,* at 11.

*ron*?  (If so, of course, every case that reaches step two of *Chevron* will be agency-reversible.)  Does the "unambiguous" dictum produce *stare decisis* effect even when a court is *affirming*, rather than *reversing,* agency action—so that in the future the agency *must adhere* to that affirmed interpretation?  If so, does the victorious agency have the right to appeal a Court of Appeals judgment in its favor, on the ground that the text in question is in fact *not* (as the Court of Appeals held) unambiguous, so the agency should be able to change its view in the future?

It is indeed a wonderful new world that the Court creates, one full of promise for administrative-law professors in need of tenure articles and, of course, for litigators.[14]  I would adhere to what has been the rule in the past: When a court interprets a statute without *Chevron* deference to agency views, its interpretation (whether or not asserted to rest upon an unambiguous text) is the law.  I might add that it is a great mystery why any of this is relevant here.  *Whatever* the *stare decisis* effect of *AT&T Corp.* v. *Portland,* 216 F. 3d 871 (CA9 2000), in the Ninth Circuit, it surely does not govern this Court's decision.  And—despite the Court's peculiar, self-abnegating suggestion to the

_____

[14] Further de-ossification may already be on the way, as the Court has hinted that an agency construction unworthy of *Chevron* deference may be able to trump one of our statutory-construction holdings.  In *Edelman* v. *Lynchburg College,* 535 U. S. 106, 114 (2002), the Court found "no need to resolve any question of deference" because the Equal Employment Opportunity Commission's rule was "the position we would adopt even if . . . we were interpreting the statute from scratch."  It nevertheless refused to say whether the agency's position was "the only one permissible."  *Id.,* at 114, n. 8 (quotation marks omitted).  JUSTICE O'CONNOR appropriately "doubt[ed] that it is possible to reserve" the question whether a regulation is entitled to *Chevron* deference "while simultaneously maintaining . . . that the agency is free to change its interpretation" in the future.  *Id.,* at 122 (opinion concurring in judgment).  In response, the Court cryptically said only that "not all deference is deference under *Chevron.*"  *Id.,* at 114, n. 8.

contrary, *ante,* at 14—the Ninth Circuit would already be obliged to abandon *Portland*'s holding in the face of *this Court's* decision that the Commission's construction of "telecommunications service" is entitled to deference and is reasonable. It is a sadness that the Court should go so far out of its way to make bad law.

I respectfully dissent.